JOSHUA D. HURWIT
UNITED STATES ATTORNEY
KATHERINE L. HORWITZ, OKLAHOMA STATE BAR NO. 30110
CHRISTIAN S. NAFZGER, IDAHO STATE BAR NO. 6286
JUSTIN WHATCOTT, IDAHO STATE BAR NO. 6444
ASSISTANT UNITED STATES ATTORNEYS
1290 W. MYRTLE STREET, SUITE 500
BOISE, IDAHO 83702
TELEPHONE: (208) 334-1211
FACSIMILE: (208) 334-1413

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>PAVEL BABICHENKO,<br>PIOTR BABICHENKO,<br>TIMOFEY BABICHENKO,<br>DAVID BIBIKOV,<br>MIKHAIL IYERUSALIMETS,<br><br>Defendants. | Case No. 1:18-cr-00258-BLW<br><br>**GOVERNMENT'S RESPONSE TO DEFENDANTS PIOTR BABICHENKO, TIM BABICHENKO, AND MIKHAIL IYERUSALIMETS' OBJECTIONS TO INITIAL PRESENTENCE INVESTIGATION REPORT (ECF 1721, 1727, 1729)** |

The United States of America, by and through Joshua D. Hurwit, United States Attorney, and the undersigned Assistant United States Attorneys for the District of Idaho, herein respond to Defendants Piotr Babichenko's (ECF 1727), Tim Babichenko's (ECF 1729), and Mikhail Iyerusalimets' (ECF 1721) objections to their respective initial presentence investigation reports.

I.  **The Initial Presentence Investigation Reports properly (and very conservatively) calculated the amount of infringement under U.S.S.G. § 2B1.1 for each Defendant.**

The PSR conservatively calculates the amount of infringement under U.S.S.G. § 2B1.1 as the amount of Amazon direct deposits received by each Defendant. As shown in Exhibit 1250, these totals are millions of dollars less than the amount traced during the scope of the conspiracies to each Defendant. Specifically, the following chart shows the amount each individual Defendant received during the scope of the conspiracies into their bank accounts traced by financial experts and investigators:

| Defendant | Amazon Deposits | Total Deposits | Exhibit(s) |
|---|---|---|---|
| Tim Babichenko | $11,004,926.31 | $25,858,795.74 | 1250 pg. 2 |
| Piotr Babichenko | $4,361,502.34 | $7,737,573.94 | 1250 pg. 4 |
| Mikhail Iyerusalimets | $4,183,572.55 | $6,276,423.72 | 1250 pg. 1 |

The trial evidence established that these financial records were incomplete. This undercounting was demonstrated by the Amazon records related to Tim Babichenko and Mikhail Iyerusalimets—who each received *millions* more during the scope of the scheme than demonstrated in the financial summary exhibits.[1]

| Defendant | Business | Amazon Deposits for "New" Products | Exhibit(s) |
|---|---|---|---|
| Tim Babichenko | Remobile | $5,104,858.74 | 1508 pg. 3 |

---

[1]  When the Amazon businesses are compared to the entities listed in Amazon deposits column in the financial summary exhibits, it is clear that not all the criminal businesses were encapsulated in the Government's financial summaries on which the calculation of infringement is estimated. *Compare* Ex. 1250, at 2 (enumerating Tim Babichenko's businesses in left-hand column and not including "Remobile"), *with* Ex. 1508, at 3 (Tim Babichenko's business, Remobile—which was started by Piotr Babichenko and "given" to his brother Tim—showing in excess of five million dollars in deposits for sales of "new" cellphones, batteries and chargers).

GOVERNMENT'S RESPONSE TO DEFENDANTS'
OBJECTIONS TO INITIAL PSR—2

| Mikhail Iyerusalimets | Cubic Wireless | $1,571,730.04 | 1509 pg. 3; 2625; 2626; 2627 |

Moreover, these financial records and Amazon records do not account for the more than 100,000 counterfeit items seized from the Large and Small Warehouse on August 22, 2018. From the Small Warehouse, agents seized nine pallets of counterfeit goods, which totaled to 13,416 separate items. *See* Trial Tr. at 2021; Ex. 2501. In the Large Warehouse, agents seized fifty-one pallets, totaling 90,357 separate items, which included 8,399 empty Apple iPhone packages and 18,768 empty Samsung packages. *See, e.g.*, Exs. 2401, 2402. These 103,773 items seized and packaged onto sixty pallets are forfeitable contraband—none are reflected in the financial or Amazon records. *See* Trial Tr. at 645–46.

Of the thousands of items sold by all Defendants, none had genuine packaging, genuine accessories, and genuine cellphones. *See* Def. Forfeiture Exhibits D7.5F–P (excel spreadsheets of various brand reviews). Each bore a counterfeit trademark on one or more of the following: the packaging, the ear buds, the charger, and the cellphone. *See* Ex. 5002; Ex. 5003; Ex. 5004A; Ex. 5005; Ex. 5006; Ex. 5008; Ex. 5009; Ex. 5010; Ex. 5100; Ex. 5205; Ex. 5201B; Exs. 5301–5350; Exs. 5404–5408; Ex. 5412; Ex. 5413A–C; Ex. 5415; Ex. 5416; Exs. 5419–5421; Ex. 5501; Exs. 5503–5513; Exs. 5601–5610.

The Amazon records show that the Defendants lied to consumers through their misrepresentations that the products were "new," as demonstrated in the Exhibits summarizing the Amazon records, Exs. 1501–09. The trial evidence likewise established that more than 90% of the products sold bore a counterfeit trademark. Brand representatives from Apple and Samsung testified that more than 90% of the items reviewed over the course of

years' long investigation bore counterfeit marks. *See, e.g.*, Trial Tr. at 2787, 2803–04, 2999, 3003, 3007.

Thousands of items seized from the Large and Small Warehouse, chats, emails, employee testimony, and financial records likewise confirmed the counterfeit nature of the vast majority of these goods, labels, and packaging. *See* Trial Tr. at 3145 (Pupko testifying that 90–95% of products came from Chinese suppliers, not auctions); *compare* Ex. 1263 (suppliers), *with* Ex. 1300 (Customs and Border Protection chart), *and* Ex. 3005-60 (Wallace United informing Pavel Babichenko that "[A]uction is not suitable for us"). The chats between all Defendants, their coconspirators, employees, and suppliers likewise underscored the permeation of the fraud throughout their business during the course of the proven conspiracy. *See, e.g.*, Trial Tr. at 3128. The trial evidence likewise established that at least 93.1% of all the goods sold by Defendants Pavel Babichenko, Tim Babichenko, Piotr Babichenko and Mikhail Iyerusalimets were *from counterfeit suppliers* (represented in green):



GOVERNMENT'S RESPONSE TO DEFENDANTS'
OBJECTIONS TO INITIAL PSR—4

*See* Ex. 1263 (showing $19,132,076.90 sent to counterfeit suppliers and $1,424,464.27 sent to legitimate suppliers).[2] Simply, the totality of the evidence more than supports the Probation Office's calculation of infringement for each Defendant.

Finally, Defendant Piotr Babichenko and others state that the trademark holder victims have "benefitted" from their criminal infringement into their rights because their products were functional, which they argue warrants a reduction in infringement amount. *See* ECF 1727, at 2–5 ("The PIR, however, fails to account for the ways in which the defendants' activities in this case actually *benefited* the trademark holders."). This rehashed—and previously rejected—argument, ignores the law applicable to trademarks, as well as the reality of the Defendants' products.

As to the law, the owner of a trademark has the right to exclude others from using that trademark or a similar mark that is likely to cause confusion in the marketplace. *See Matal v. Tam*, 137 S. Ct. 1744, 1751 (2017). The main function of a trademark is to identify and distinguish goods or services as the product of a particular manufacturer or merchant and to protect its goodwill. *Id.* In fact, "good will and its tangible symbol, a trademark, are

---

[2] United Inform was a supplier of goods bearing counterfeit marks frequently used throughout the ten-year conspiracy. *See* Ex. 1300; Ex. 2622; Exs. 3005-1–3005-67; Ex. 3006; Ex. 3020; Ex. 1263; Ex. 3020; Ex. 1263; Ex. 2601; Ex. 2401; Ex. 2403; Ex. 2467; Ex. 2479; Ex. 2820-24; Ex. 4176; Ex. 4227; Ex. 4239; Ex. 4252; Ex. 4261A; Ex. 4261B; Ex. 4702; Ex. 4703; Ex. 3604. Windigital was a supplier of goods bearing counterfeit marks frequently used throughout the ten-year conspiracy. *See* Ex. 1263; Ex. 2008D; Ex. 3646; Ex. 3647; Ex. 3653; Exs. 3671-1–3671-20; Ex. 4092; Ex. 4102; Ex. 4120; Ex. 4231; Ex. 4242. Sennex was a supplier of goods bearing counterfeit marks frequently used throughout the ten-year conspiracy. *See* Ex. 1263; Ex. 2403; Ex. 2442; Ex. 2479; Ex. 3604; Ex. 4098; Ex. 4161; Ex. 4193; Ex. 4421. Topphone was a supplier of goods bearing counterfeit marks frequently used throughout the ten-year conspiracy. Ex. 1263; Ex. 2434; Ex. 2442; Ex. 3604; Ex. 3655; Ex. 3656. Wiss Wireless was a supplier of goods bearing counterfeit marks frequently used throughout the ten-year conspiracy. Ex. 1263; Ex. 3019; Ex. 3025; Ex. 3040; Ex. 3088; Ex. 3654; Ex. 3661; Ex. 4264.

inseparable. A trademark has no independent significance apart from the good will it symbolizes." J. McCarthy, Trademarks and Unfair Competition § 2:16 (5th ed. 2021) (hereinafter McCarthy). Trademarks also protect public consumers: "An important beneficiary of the trademark system is the public. The public has a great interest in administration of the trademark law in a manner that protects against confusion." *Guthrie Healthcare Sys. v. ContextMedia, Inc.*, 826 F.3d 27, 50 (2d Cir. 2016); *see also Trafficschool.com, Inc. v. Edriver Inc.*, 653 F.3d 820, 827 (9th Cir. 2011); McCarthy § 5:2 (declining to "select as paramount" either of the dual goals of trademark law identified).

Infringers who use a counterfeit mark, as defined by the statute, face civil and criminal penalties. *See NuPulse, Inc. v. Schlueter Co.*, 853 F.2d 545 (7th Cir. 1988) ("When we view the Lanham Act in its totality, it is clear that Congress intended to create a self-contained statutory device to deal with all kinds of trademark infringement and unfair competition."); *United States v. Hon*, 904 F.2d 803, 806 (2d Cir. 1990) ("Congress enacted section 2320 in response to an increasing tide of commercial trademark counterfeiting and wished to impose stiff criminal penalties upon those whose intentional acts were previously subject only to civil sanctions under the Lanham Act.").

Section 2320 was "not just designed for the protection of consumers," but also for "the protection of trademarks themselves and for the prevention of the cheapening and dilution of the genuine product." *Hon*, 904 F.2d at 806. In this vein, "[o]ne of the rights that a trademark confers upon its owner is the 'right to control the quality of the goods manufactured and sold' under that trademark. *For this purpose the actual quality of the goods is irrelevant*; it is the *control of quality* that a trademark holder is entitled to maintain." *United States v. Farmer*, 370 F.3d 435, 441 (4th Cir. 2004) (emphases added). The functionality of a product bearing a counterfeit

mark is wholly irrelevant to the infringement of the mark. *See Intel Corp. v. Terabyte Intern., Inc.*, 6 F.3d 614, 619 (9th Cir. 1993) (distinguishing between genuine product being altered and non-genuine articles bearing counterfeit mark as "classic counterfeiting" (citing *Playboy Enters. v. Baccarat Clothing Co.*, 692 F.2d 1272 (9th Cir. 1982)); *Foote*, 413 F.3d at 1246 ("[T]he correct test is whether the defendant's use of the mark was likely to cause confusion . . . in the public in general.").

No doubt, t-shirts and bags bearing counterfeit trademarks still function to cover the wearer and hold items. This functionality does not shield the peddler from penalties for knowingly trafficking in items bearing a counterfeit trademark under § 2320. *See, e.g.*, *United States v. Chong Lam*, 677 F.3d 190, 199–200 (4th Cir. 2012) (affirming § 2320 conviction for counterfeit handbags); *see also United States v. Kim*, No. CR-07-170-S-BLW, 2008 WL 5054584 (D. Idaho Aug. 29, 2008) (sentencing defendant convicted of trafficking in counterfeit t-shirts under § 2320). Thus, a defendant would be guilty of trademark infringement even if he placed a counterfeit mark on a product that was of the same or higher quality as a product bearing the genuine mark (so long as the other elements under § 2320 were satisfied). He does not have the right to affix the counterfeit mark on any product—regardless of its quality. The "valuable asset" is the mark and the consumers' recognition of the same. *See* McCarthy § 2:10 (recognizing "GOOGLE, APPLE, IBM, and SAMSUNG" as "well-known marks" that are "valued in the many billions of dollars").

Not only have the Defendants ignored the legal reality that they sold criminally infringing products under § 2320 in their argument that no harm was caused by their decades' long crime, but they have also ignored that their products were subpar and dangerous. Numerous real-world consumers testified that the Defendants' products had faulty circuitry

and caused electrical failure. Testimony from a safety expert likewise affirmed the dangerousness of counterfeit electrical products.

In 2016, UL conducted testing on 400 counterfeit Apple style cellphone chargers and published a study of the results, explaining the dangers posed to consumers of these counterfeit Apple style cellphone chargers. *See* ECF 340-5. UL reported a 99% fail rate among counterfeit iPhone chargers in the electrical strength test. *See id.* In the same study, UL determined that 12 of the 400 tested chargers posed a risk of lethal electrocution. *See id.* This risk is a natural byproduct of counterfeit cellphone chargers' poor and inconsistent manufacturing quality. *See id.* ("[P]ower adapters bearing counterfeit UL marks typically contain less sophisticated circuits, fail to deliver their advertised current and voltage, and fail when tested to safety standards.").

In addition to that 2016 case study, UL tested the Defendant's products. UL's testing in this case proved that the Defendants' chargers branded with counterfeit Samsung and Apple trademarks were subpar and dangerous: Mr. Pollock and his team conducted similar testing on 117 cellphone chargers seized from the Defendants. *See* Ex. 2822. All failed even the most basic testing. *See id.* Through demonstratives, UL representative Bob Pollock explained that the Defendants' products quickly failed the most basic safety testing: all but 13 chargers (represented in the green dots) failed testing that is associated with risks posed by poorly constructed circuit boards inside of chargers, which is the catalyst for shock or fire when plugged into an electrical outlet. The remaining tested chargers (represented in the red dots) all pose a risk of electric shock when plugged into a wall outlet.



*See also* Ex. D-2822.

The Defendants' products failed in the lab and in real life. Ms. Kari Krause testified that the charger she purchased from Wireless Closeouts—one of Tim Babichenko's business—popped when it was plugged into the electrical outlet, as did other consumers. *See* Trial Tr. 1, Day 5, at 210; 164:20–:22 ("So it just started to hiss which is a pretty remarkable thing for a charger to do."); *see also* Ex. 2105 (photograph of burned charger). That is exactly the type of failure the electrical stress test uncovers. Mr. Steve Kroll experienced a similar failure: a charger he purchased from Cell2U4Less—an entity run by Arthur Pupko for Pavel Babichenko—started hissing and got hot the first time he plugged it in. *See* Ex. 2106 (photograph of charger that "hissed" when plugged into the electrical outlet). Even more such instances were documented in e-mail complaints sent to the Defendants. *See* Ex. 2011B (customer Adam Birch complaining to "Remobile" that the fake charger sold to him "could have set fire to my home had I not caught it soon enough").

The totality of trial evidence demonstrates the scope of the infringing amount under U.S.S.G. § 2B1.1 well exceeds more $25,000,000 *for each* member of the conspiracies proven during trial. *See* U.S.S.G. § 2B1.1. Accordingly, the Probation Office's calculation of the Amazon deposits for each conspirator very conservatively estimates the infringement attributable to each Defendant's sales, which itself undervalues the total each Defendant received during the conspiracy by millions of dollars. The Defendants' objections seeking further reduction are meritless.

II. **Piotr Babichenko, Tim Babichenko, and Mikhail Iyerusalimets directed, led, and organized other criminal participates during the scope of proven conspiracy.**

During trial, the evidence demonstrated the leadership and organizer roles of Piotr Babichenko, Tim Babichenko, and Mikhail Iyerusalimets. Each directed conspirators during the conspiracy and convinced employees to set aside their concern with continued participation in the crime. Each also directed other coconspirators on how to continue their scheme and organize their businesses to ensure continued participation, as detailed herein:

| Defendant | Conduct | Exhibits |
|---|---|---|
| Piotr Babichenko | Created mailboxes and businesses for conspirators | 1400; 1509; 1606; 1612 |
| Piotr Babichenko | Supplied others with phones | 2818-15 |
| Piotr Babichenko | Employed coconspirators who were used during scheme | 2428; 2491; 2493; 3221-062 |
| Piotr Babichenko | Coconspirators turned to as the "knowledgeable one," often asking or turning to him for help; and he instructed them on how to sell | 2818-18 (Peter is "knowledgeable one"); 3221-024 pg. 3; 3221-092 pg. 1 ("I'll ask Peter"); |
| Piotr Babichenko | Instructed others as to how to evade detection during criminal scheme | 3665; 3667; 3668; 3669; 3670 (customs response extracted from Piotr's computer but written for Pavel); 4091 |
| Tim Babichenko | Employed coconspirators who were used during scheme, including so- | 1001; 2457; 2466; 2474; 2478; 2452; 2471; 1253 pg. 4 (showing deposits from 6% |

GOVERNMENT'S RESPONSE TO DEFENDANTS'
OBJECTIONS TO INITIAL PSR—10

|  | called 6% who operated their own Amazon accounts | Vahdim Galushkin, Vitalia Gotra, Innessa Babichenko, Valeriy Kaminsky, Igor and Natalya Babichenko, Alex Trofimuk, and Nik Bukhanstov, among others); 4098; 4103; 4504 |
|---|---|---|
| Tim Babichenko | Instructed coconspirator-employees how to evade detection | 4108; 4122; 4123; 4132; 4143A; 4143B; 4178; 3121; 3132; 3135; 3140; 3144; 4211; 4213; 4285 |
| Mikhail Iyerusalimets | Sent coconspirator–employee instructions for making used phones look new and overseeing such testing; used employee as 6% | 4611; 2010A; 1025; 4613 (showing $10,000 transfer through PayPal); Def. Ex. 14380 (Proffer Agreement with Government and employee) |
| Mikhail Iyerusalimets | Organized inventory for Pavel and Tim Babichenko | 4434 |
| Mikhail Iyerusalimets | Coordinated payment from coconspirator and "employee" "Lazukin" to Pavel | 3558 pg. 7 |
| Mikhail Iyerusalimets | Provided instructions on operation of scheme, including evading detection, instructing the price of products, and method of online sales of cellphone products | Sentencing Exhibit 1 Sentencing Exhibit 2 |

The totality of trial evidence supports the Probation Office's enhancements under U.S.S.G. § 3B1.1. The Defendants' objections—based on a minimization of their roles—are unfounded.

## Conclusion

Based on the above, the government respectfully responds to Defendants Piotr Babichenko, Tim Babichenko, and Mikhail Iyerusalimets' objections to the initial presentence investigation reports.

JOSHUA D. HURWIT
UNITED STATES ATTORNEY
By:

 */s/ Katherine L. Horwitz*
KATHERINE L. HORWITZ
Assistant United States Attorney

 */s/ Christian Nafzger*
 CHRISTIAN NAFZGER
Assistant United States Attorney

 */s/ Justin Whatcott*
 JUSTIN WHATCOTT
 Assistant United States Attorney

# CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on February 27, 2023, the foregoing RESPONSE TO OBJECTIONS TO INITIAL PSR was electronically filed with the Clerk of the Court using the CM/ECF system, and that a copy was served on the following parties or counsel by:

| |
|---|
| JOHN DEFRANCO<br>1031 E. Park Blvd.<br>Boise, ID 83712<br>jcd@greyhawklaw.com<br>*Attorney for Pavel Babichenko* |
| PAUL E. RIGGINS<br>380 South 4th Street, Ste. 104<br>Boise, ID 83702<br>rigginslaw@gmail.com<br>*Attorney for Piotr Babichenko* |
| ROBYN A. FYFFE<br>P.O. Box 5681<br>Boise, ID 83705<br>robyn@fyffelaw.com<br>*Attorney for David Bibikov* |
| ELLEN NICHOLE SMITH<br>P.O. Box 140857<br>Garden City, ID 83714<br>ellen@smithhorras.com<br>*Attorney for Mikhail Iyerusalimets* |
| ROB S. LEWIS<br>913 W. River Street, Ste. 430<br>Boise, ID 83702<br>office@roblewislaw.com<br>*Attorney for Timofey Babichenko* |

        /s/ Katherine Horwitz
       Assistant United States Attorney